IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
4:13-CV-53-D

| | | |
|---|---|---|
| JAMES C. FOX, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

In this action, plaintiff James C. Fox, Jr. ("plaintiff") challenges the final decision of defendant Acting Commissioner of Social Security Carolyn W. Colvin ("Commissioner") denying his application for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") on the grounds that he is not disabled.[1] The case is before the court on the respective parties' motions for judgment on the pleadings. (D.E. 21, 24). Each party filed a memorandum in support of its motion (D.E. 21-1, 25) and plaintiff filed a reply (D.E. 26). The motions were referred to the undersigned Magistrate Judge for a memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (Minute Entry dated 18 Oct. 2013). For the reasons set forth below, it will be recommended that plaintiff's motion be allowed, the Commissioner's motion be denied, and this case be remanded.

---

[1] The statutes and regulations applicable to disability determinations for DIB and SSI are in most respects the same. The provisions relating to DIB are found in 42 U.S.C. subch. II, §§ 401, *et seq.* and 20 C.F.R. pt. 404, and those relating to SSI in 42 U.S.C. subch. XVI, §§ 1381, *et seq.* and 20 C.F.R. pt. 416.

## I. BACKGROUND

### A. Case History

Plaintiff filed applications for DIB and SSI on 26 May 2009, alleging a disability onset date of 23 September 2004. Transcript of Proceedings ("Tr.") 11, 136-42. The applications were denied initially and upon reconsideration, and a request for hearing was timely filed. Tr. 11, 76, 95-96. On 22 September 2011, a video hearing was held before an Administrative Law Judge ("ALJ"). Tr. 27-59. In a written decision dated 11 January 2012, the ALJ found that plaintiff was not disabled and therefore not entitled to DIB or SSI. Tr. 11-21. Plaintiff timely requested review by the Appeals Council. Tr. 7. On 16 January 2013, the Appeals Council denied the request for review. Tr. 1-6. At that time, the decision of the ALJ became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481. Plaintiff commenced this proceeding for judicial review on 27 February 2013, pursuant to 42 U.S.C. §§ 405(g) (DIB) and 1383(c)(3) (SSI). (*See In Forma Pauperis* Mot. (D.E. 1), Order Allowing Mot. (D.E. 4), Compl. (D.E. 5)).

### B. Standards for Disability

The Social Security Act ("Act") defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 42 U.S.C. § 1382c(a)(3)(A); *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial

gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A); *see* 42 U.S.C. §

1382c(a)(3)(B).  The Act defines a physical or mental impairment as "an impairment that results

from anatomical, physiological, or psychological abnormalities which are demonstrable by

medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3),

1382c(a)(3)(D).

The disability regulations under the Act ("Regulations") provide a five-step analysis that

the ALJ must follow when determining whether a claimant is disabled:

> (i) At the first step, we consider your work activity, if any.  If you are doing
> substantial gainful activity, we will find that you are not disabled. . . .

> (ii) At the second step, we consider the medical severity of your impairment(s).  If
> you do not have a severe medically determinable physical or mental impairment
> that meets the duration requirement in [§ 404.1509 for DIB and § 416.909 for
> SSI], or a combination of impairments that is severe and meets the duration
> requirement, we will find that you are not disabled. . . .

> (iii) At the third step, we also consider the medical severity of your
> impairment(s). If you have an impairment(s) that meets or equals one of our
> listings in [20 C.F.R. pt. 404, subpt. P, app. 1] . . . and meets the duration
> requirement, we will find that you are disabled. . . .

> (iv) At the fourth step, we consider our assessment of your residual functional
> capacity ["RFC"] and your past relevant work.  If you can still do your past
> relevant work, we will find that you are not disabled. . . .

> (v) At the fifth and last step, we consider our assessment of your [RFC] and your
> age, education, and work experience to see if you can make an adjustment to other
> work.  If you can make an adjustment to other work, we will find that you are not
> disabled.  If you cannot make an adjustment to other work, we will find that you
> are disabled.  . . . .

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

The burden of proof and production rests with the claimant during the first four steps of

the analysis.  *Pass*, 65 F.3d at 1203.  The burden shifts to the Commissioner at the fifth step to

show that alternative work is available for the claimant in the national economy.  *Id.*

In the case of multiple impairments, the Regulations require that the ALJ "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F.R. §§ 404.1523, 416.923. If a medically severe combination of impairments is found, the combined impact of those impairments will be considered throughout the disability determination process. *Id.*

### C. Findings of the ALJ

Plaintiff was 38 years old on the alleged onset date of disability and 45 years old on the date of the administrative hearing. Tr. 20 ¶ 7. He has an eleventh grade education. Tr. 20 ¶ 8; 33. His past work includes employment as a floor installer and kitchen helper. Tr. 20 ¶ 6; 34.

Applying the five-step analysis of 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), the ALJ found at step one that plaintiff had not engaged in substantial gainful activity since his alleged onset of disability. Tr. 13 ¶ 2. At step two, the ALJ found that plaintiff had the following medically determinable impairments that were severe within the meaning of the Regulations: degenerative disc disease of the lumbar spine; psychotic disorder; bipolar disorder; diabetes mellitus; and hypertension. Tr. 13 ¶ 3. At step three, the ALJ found that plaintiff's impairments did not meet or medically equal any of the listings. Tr. 14 ¶ 4.

The ALJ next determined that plaintiff had the RFC to perform medium work with certain limitations. Tr. 16 ¶ 5. Medium work involves lifting, carrying, pushing, or pulling up to 50 pounds occasionally and 25 pounds frequently. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c).[2] The specific limitations were as follows:

---

[2] *See also Dictionary of Occupational Titles* (U.S. Dep't of Labor 4th ed. rev. 1991) ("DOT"), app. C § IV.c, def. of "Medium Work," http://www.oalj.dol.gov/libdot.htm (last visited 4 Feb. 2014). "Medium work" and the other terms for exertional level as used in the Regulations have the same meaning as in the DOT. *See* 20 C.F.R. §§ 404.1567, 416.967.

> [H]e should avoid climbing ladders, ropes, and scaffolds and concentrated exposure to hazards. The claimant is limited to performing simple, routine, and repetitive tasks, in that he can apply common sense understanding to carry out oral, written and diagrammatic instructions, in a low-stress work environment; and he can have occasional contact with the public and frequent contact with co-workers.

Tr. 16 ¶ 5.

In reaching this RFC determination, the ALJ gave little weight to the opinions of plaintiff's treating psychiatrist, Mark O'Daniel, D.O., and a physician's assistant who works with Dr. O'Daniel, Donna Shelton, both of LeChris Counseling Service ("LeChris Counseling"), but gave significant weight to the opinions of two state agency psychological consultants. Tr. 18-19 ¶ 5. The ALJ also found plaintiff only partially credible. Tr. 19 ¶ 5. It is these determinations that are the focus of plaintiff's appeal.

Based on his determination of plaintiff's RFC, the ALJ found at step four that plaintiff was not capable of performing his past relevant work. Tr. 19 ¶ 6. At step five, the ALJ accepted the testimony of a vocational expert and found that there were jobs in the national economy existing in significant numbers that plaintiff could perform, including jobs in the occupations of cleaner II, dining room attendant, and laundry worker. Tr. 20-21 ¶ 10; 55-56. The ALJ accordingly concluded that plaintiff was not disabled. Tr. 21 ¶ 11.

### D. Standard of Review

Under 42 U.S.C. § 405(g), judicial review of the final decision of the Commissioner is limited to considering whether the Commissioner's decision is supported by substantial evidence in the record and whether the appropriate legal standards were applied. *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Unless the court finds that the Commissioner's decision is not supported by substantial evidence or that the wrong legal standard was applied, the Commissioner's decision must be upheld. *See*

Case 4:13-cv-00053-D   Document 29   Filed 02/05/14   Page 5 of 24

*Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Perales*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is more than a scintilla of evidence, but somewhat less than a preponderance. *Perales*, 402 U.S. at 401.

The court may not substitute its judgment for that of the Commissioner as long as the decision is supported by substantial evidence. *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). In addition, the court may not make findings of fact, revisit inconsistent evidence, or make determinations of credibility. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979). A Commissioner's decision based on substantial evidence must be affirmed, even if the reviewing court would have reached a different conclusion. *Blalock*, 483 F.2d at 775.

Before a court can determine whether a decision is supported by substantial evidence, it must ascertain whether the Commissioner has considered all relevant evidence and sufficiently explained the weight given to probative evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997). "Judicial review of an administrative decision is impossible without an adequate explanation of that decision by the administrator." *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

### E. Standards for Evaluation of Opinion Evidence from Medical Sources

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions."

20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). An ALJ must consider all medical opinions in a case in determining whether a claimant is disabled. *See id.* §§ 404.1527(c), 416.927(c); *Nicholson v. Comm'r of Soc. Sec. Admin.*, 600 F. Supp. 2d 740, 752 (N.D. W.Va. 2009) ("Pursuant to 20 C.F.R. §§ 404.1527(b), 416.927(b), an ALJ must consider all medical opinions when determining the disability status of a claimant.").

The Regulations provide that opinions of treating physicians and psychologists on the nature and severity of impairments are to be accorded controlling weight if they are well supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see Craig*, 76 F.3d at 590; *Ward v. Chater*, 924 F. Supp. 53, 55-56 (W.D. Va. 1996); Soc. Sec. R. 96-2p, 1996 WL 374188 (2 July 1996). Otherwise, the opinions are to be given significantly less weight. *Craig*, 76 F.3d at 590. In this circumstance, the Regulations prescribe factors to be considered in determining the weight to be ascribed, including the length and nature of the treating relationship, the supportability of the opinions, and their consistency with the record. 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6).

The ALJ's "decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. R. 96-2p, 1996 WL 374188, at *5; *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Ashmore v. Colvin*, No. 0:11-2865-TMC, 2013 WL 837643, at *2 (D.S.C. 6 Mar. 2013) ("In doing so [i.e., giving less weight to the testimony of a treating physician], the ALJ must explain what weight is given to a treating physician's opinion and give specific reasons for his decision to discount the opinion.").

Where there are multiple opinions from a single source, an ALJ does not necessarily have to discuss each opinion separately to make clear the weight given it and the underlying reasons. *See* Soc. Sec. R. 96-2p, 1996 WL 374188, at *2.

The same factors used to determine the weight to be accorded the opinions of physicians and psychologists (and other so-called "acceptable medical sources") apply to the opinions of providers who are deemed to be at a different professional level (or so-called "other sources"), such as psychological counselors, therapists, or physicians' assistants. *See* Soc. Sec. R. 06-03p, 2006 WL 2329939, at *4 (9 Aug. 2006); *see also* 20 C.F.R. §§ 404.1527(d) (evaluation of opinion evidence), 416.927(d) (same); §§ 404.1513(d)(1) (including physicians' assistants as "other sources"), 416.913(d)(1) (same). As with opinions from physicians and psychologists, the ALJ must explain the weight given opinions of other sources and the reasons for the weight given. *See* Soc. Sec. R. 06-03p, 2006 WL 2329939, at *6 ("[The ALJ] generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."); *Napier v. Astrue*, No. TJS-12-1096, 2013 WL 1856469, at *2 (D. Md. 1 May 2013) ("[T]he ALJ is required to 'explain in the decision the weight given to . . . any opinions from treating sources, non-treating sources, and other non-examination sources who do not work for the [the Social Security Administration].").

The opinions of physicians and psychologists, and other sources on issues reserved to the Commissioner, that is, legal conclusions, are not entitled to special weight because of their source, including statements that the claimant is disabled or unable to work. 20 C.F.R. §§

404.1527(e)(1), (3), 416.927(e)(1), (3).  But these opinions must still be evaluated and accorded

appropriate weight.  *See* Soc. Sec. R. 96-5p, 1996 WL 374183, at *3 (2 July 1996).

## II.  OVERVIEW OF PLAINTIFF'S CONTENTIONS

Plaintiff contends that the ALJ erred by (1) improperly rejecting the opinions of

psychiatrist Dr. O'Daniel and P.A. Shelton of LeChris Counseling, while crediting the opinions

of the state agency psychological consultants; and (2) improperly evaluating plaintiff's

credibility.  The court will address each issue separately.

## III.  ALJ'S EVALUATION OF MENTAL IMPAIRMENT OPINION EVIDENCE

### A.  Plaintiff's Mental Health History

Plaintiff's mental health history began with his first of three involuntary commitments,

from 18 to 23 May 2005.  Tr. 418.  The ALJ described this initial commitment as follows:

> Mental treatment began in May 2005, when the claimant was involuntarily
> committed to Cherry Hospital, on petition from his spouse at that time.  He was
> hearing voices and acting in a threatening manner after allegedly not being able to
> fall asleep for eight days.  Upon admission, the claimant had a Global Assessment
> of Functioning (GAF) score of 28, indicating that his behavior was considerably
> influenced by delusions or hallucinations.  After treatment with Seroquel, therapy,
> and rest, his GAF score increased at discharge to 60, indicating that his symptoms
> were only moderate.  The claimant's affect was euthymic and reactive and
> thought processes were logical and goal-directed.

Tr. 17-18 ¶ 5.  The conduct prompting this commitment included threats made to police.  Tr.

418.  The diagnosis for plaintiff was psychotic disorder, not otherwise specified. Tr. 422.

Plaintiff's second commitment was from 1 to 9 September 2005 (Tr. 411) and was also

described by the ALJ:

> He was involuntarily committed to Cherry Hospital again in September 2005, on
> petition by his spouse at that time.  The claimant was having violent outbursts and
> visual and auditory hallucinations.  The hospital records noted that the claimant
> had not been taking his medications for several months.  Upon admission, the
> claimant had a GAF score of 28, indicating that his behavior was considerably
> influenced by delusions or hallucinations.  He was treated with medication and

therapy. Upon discharge, the claimant still had serious impairment with a GAF score of 45, but his mood was calm with euthymic affect and goal-directed thought processes. Medications were changed to Risperdal, Risperdal Consta, and Cogentin.

Tr. 18 ¶ 5. The conduct by plaintiff underlying this commitment included his choking his son and wife. Tr. 413.

Plaintiff was involuntarily committed for a third time from 19 April to 15 May 2009 by his current fiancée, Edith Mullins. Tr. 242. Mullins testified that she has lived with plaintiff since 2009, and she is the mother of plaintiff's daughter. Tr. 17, 44. The ALJ described this commitment by stating:

After a petition submitted by his girlfriend, the claimant was involuntarily committed to Cherry Hospital in April 2009. He was suspicious, paranoid, guarded, and bizarre, with an irritable mood and constricted affect. The treatment records again noted noncompliance with medication, and the claimant's GAF score upon admission was 30. After treatment with medication and therapy, his GAF score improved to 61, indicating that his symptoms were only mild.

Tr. 18 ¶ 5.

The specific circumstances that prompted this commitment were described by Mullins as follows:

I had noticed he was having some schizophrenia activity, he would was cutting holes in the wall looking for microphones, I hadn't -- paper towels over the light fixtures, scared of people spying in on him, being really aggressive and ugly, so I had him he had -- I was pregnant at the time and he told me that I was not pregnant with his child, that I had a basketball underneath my shirt and that he was going to take a knife and kill -- and stab the basketball to prove that I was not pregnant and so I had instead of having him locked up I knew that he was having some mental issues so I went and had him committed to Cherry Hospital.

Tr. 44-45; *see also* 242 (Cherry Hospital discharge summary). Plaintiff apparently told Mullins that she was lucky that he did not just kill her. Tr. 242. His diagnosis upon discharge was schizophrenia, paranoid type. Tr. 245.

In May 2009, plaintiff began treatment at Onslow County Behavioral Healthcare Services

("OCBHS"), as noted by the ALJ:

> [H]is symptoms were initially assessed as serious, with a GAF score of 45. The claimant presented to an emergency room in June 2009, complaining of hallucinations and agitation and requested a medication refill. He reported that he had been out of Risperdal for two to three weeks and said he felt that his lack of medication was calling his problems. After receiving a shot of Risperdal Consta, he left the hospital in stable condition.

> Subsequent treatment records from OCBHS in August 2009 noted that the claimant's mood was stable, and his GAF score was 55 indicating that his symptoms were only moderate. The claimant reported eating and sleeping well.

Tr. 18 ¶ 5.

### B.    Plaintiff's Treatment at LeChris Counseling

Plaintiff began treatment at LeChris Counseling in January of 2010, where he continues

to be diagnosed with schizophrenia, paranoid type. Tr. 454, 455. Dr. O'Daniel describes

plaintiff's treatment as follows:  Plaintiff receives treatment from an Assertive Community

Treatment ("ACT")[3] team, composed of Dr. O'Daniel, P.A. Shelton, a nurse, a therapist, and a

vocational counselor. Tr. 455; *see also* Tr. 40 (plaintiff's testimony). His treatment includes

biweekly injections of Risperdal for his schizophrenia; Invega on an as-needed basis for

breakthrough hallucinations; Celexa for depression; and Trazadone for sleep. Tr. 455. He also

sees Dr. O'Daniel and/or P.A. Shelton every two weeks for medication management. Tr. 454,

455. In addition, he regularly sees his therapist. Tr. 456.

---

[3] An ACT Team has been described as follows:

> Assertive community treatment (ACT) is a type of case management. Your ACT team includes a case manager, doctor, psychiatrist, and nurse. Your team can help you 24 hours a day, 7 days a week. You get care where you live. You don't have to stay in or visit a health care center to get treatment. Your team can: Deliver medicine to your home. Provide many types of treatment. Help you with social skills, schooling, and work. Watch for problems in your mental and physical health. Help you keep in touch with your family. Help with routine tasks such as laundry, shopping, cooking, grooming, and getting around. Assertive community treatment makes going to the hospital less likely if you have a relapse.

Entry for "Case Management for Schizophrenia," http://www.webmd.com/a-to-z-guides/case-management-for-schizophrenia-topic-overview (last visited 4 Feb. 2014).

According to plaintiff, LeChris Counseling personnel are at his home three times a week. Tr. 39. He testified that they are there to check on his status, give him medication (including injections), and provide any needed assistance. Tr. 39.

### C. Medical Source Statement of Dr. O'Daniel

Dr. O'Daniel completed a medical source statement dated 25 August 2011 in support of plaintiff's applications for Social Security benefits. Tr. 455-56. After summarizing plaintiff's mental health history and his medications, Dr. O'Daniel stated:

> His mood is up and down; he frequently has insomnia, sometimes sleeping only four hours a night, or going a few days without sleep; he has periods of agitation and irritability; and he has thoughts of suicide. We recently increased his antidepressant due to suicidal ideation. There are negative side effects to his medications, particularly the Invega that he takes when he has hallucinations, or feels them coming on. Invega causes sleepiness, which reduce his attention and concentration.

> Mr. Fox has good days and bad days. Our records include references to his mood being "good" or "fine," as well observations that he appears "stable, clear, cogent." These are intended as snapshots as to how he is at that particular time. I definitely do not believe that his good days are consistent enough to enable him to show up for work on a regular and continuing basis, five days a week, eight hours a day. He is as stable as he is because of his frequent visits to LeChris, with Donna Shelton and myself, with his therapist, and with the nurse for medication injections every two weeks. Despite his compliance and our close monitoring, he still has intermittent hallucinations. Too, the medications he takes to control his hallucinations and mood interfere with his memory, attention and focus,

> Based on a review of the records, my treatment of Mr. Fox, consultation with other medical providers, and my training and expertise, I believe it is inadvisable for Mr. Fox to try to work on a full-time or even part-time basis. Increased stress and change in routine are likely to exacerbate his symptoms.

Tr. 455-56.

### D. Medical Examination Report of P.A. Shelton

P.A. Shelton completed a medical examination report for Carteret County Department of Social Services dated 15 March 2011. Tr. 396-97. In addition to describing plaintiff's treatment

regimen, she stated that plaintiff has "problems with focusing, comprehension" and experiences "debilitating depression." Tr. 397. She opined that plaintiff "continues to experience intermittent auditory/visual hallucinations. . . . decreasing his ability to perform tasks of any kind." Tr. 397.

### E. Analysis

The ALJ gave two basic reasons for his attribution of little weight to the medical opinions of Dr. O'Daniel: they related to a matter reserved to the Commissioner and they are inconsistent with Dr. O'Daniel's notes and other objective evidence. The ALJ stated:

> As for the opinion evidence, Dr. O'Daniel opined on August 25, 2011, that the claimant could not show up for work on a regular and continuing basis, and it would not be advisable for him to try to work on even a part-time basis (Ex. 21F). An opinion on whether or not a claimant is unable to work is not a medical opinion; it is an administrative finding dispositive of a case, requiring familiarity with the regulations and legal standards set forth therein (20 CFR 404.1527(e)(1) and (2) 20 CFR 416.927(e)(1) and (2)). Moreover, an opinion on an issue reserved to the Commissioner, such as that of Dr. O'Daniel can never be entitled to controlling weight. However, it must be carefully considered to determine the extent to which it is supported by the record as a whole or are contradicted by persuasive evidence (20 CFR 404.1527(d), 20CFR 416.927(d)(2), and SSR 96-5p). In this case, Dr. O'Daniel was the claimant's treating D.O.. *However, the objective evidence, including Dr. O'Daniel's own treatment notes consistently documented normal findings, consistent improvement, and stabilization of symptoms*. Because of this inconsistency, undersigned has given Dr. O'Daniel's opinion little weight.

Tr. 18-19 ¶ 5 (emphasis). This emphasized summary description of Dr. O'Daniel's treatment notes is supplemented by a series of more specific findings made by the ALJ earlier in his decision:

> The initial records from January 2010 noted symptoms of paranoia and a sad affect with some poor insight and judgment. However, *at every subsequent visit* through the most recent records in August 2011, Dr. O'Daniel documented that the claimant had normal appearance, normal speech, normal motor activity, normal attention and concentration, normal flow of thought, normal thought content, and normal mood and affect. A longitudinal examination of the treatment notes reveals *consistent improvement in mood and affect* and *consistent*

*documentation of the claimant being stable, clear, and cogent.* The records from
August 2011 noted that the claimant said his mood was fine, and he and his
family were doing well (Ex. 3F, 4F, 8F, 1IF, 13F, and 18F- 20F).

Tr. 18 ¶ 5 (emphasis added).

It is, of course, true, as noted previously, that whether or not a claimant is disabled is a

matter reserved to the Commissioner and not entitled to special weight because of its source.

Even assuming that Dr. O'Daniel's finding that plaintiff lacks the ability to work on a regular

and continuing basis comes within the scope of this principle, there is still error in the ALJ's

evaluation. It lies in his mischaracterization of Dr. O'Daniel's treatment notes.

An example is the specific finding that at "every subsequent visit" following plaintiff's

initial consultation with Dr. O'Daniel, it was documented that he had "normal appearance,"

"normal speech," "normal motor activity," "normal attention and concentration," "normal flow

of thought," "normal thought content," and "normal mood and affect." Tr. 18 ¶ 5. This finding

is factually incorrect. In fact, the treatment notes from visits subsequent to the initial consult

include the following: poor insight and judgment and content of thought as suspiciousness on 8

April 2010 (Tr. 447); poor insight and judgment on 22 April 2010 (Tr. 446); poor insight and

judgment on 6 May 2010 (Tr. 445); speech as reduced on 20 May 2010 (Tr. 444); flow of

thought as indecisive on 5 August 2010 (Tr. 440); general appearance as very slightly sad on 19

August 2010 (Tr. 439); speech as reduced and mood and affect as mildly depressed on 9

December 2010 (Tr. 434); general appearance as sad, speech as reduced amount, content of

thought as somatic complaints and depressed mood on 3 February 2011 (Tr. 431); general

appearance as sad and worried, speech as reduced amount, flow of thought as indecisive, and

mood and affect as depressed on 2 June 2011 (Tr. 427); and general appearance as sad, speech as

reduced amount, and mood as depressed on 14 July 2011 (Tr. 425). The error in this specific

finding by the ALJ undercuts his summary finding that "Dr. O'Daniel's own treatment notes consistently documented normal findings."  Tr. 18 ¶ 5.

Similar deficiencies characterize the ALJ's specific finding that Dr. O'Daniel's records reveal "consistent improvement in mood and affect and consistent documentation of the claimant being stable, clear, and cogent" (Tr. 18 ¶ 5) and the summary finding that the records show "consistent improvement, and stabilization of symptoms" (Tr. 19 ¶ 5).   In fact, the records include treatment notes that indicate breakthrough hallucinations (28 January 2010, Tr. 452); breakthrough auditory hallucinations at times (25 Mar. 2010, Tr. 448); "crazy thoughts" (8 April 2010, Tr. 447); increased anger (5 May 2010, Tr. 445); mood up and down with suicidal/homicidal ideation (10 May 2011, Tr. 444); times of agitation (29 July 2010, Tr. 441); plaintiff being a little depressed (19 August 2010, Tr. 439); hallucinations (16 September 2010, Tr. 438); sometimes suffering from paranoia and talk of hurting himself and others (29 October 2010, Tr. 437); hearing voices for 30 minutes and poor sleeping (9 December 2010, Tr. 434); increased depression with no precipitating event (2 June 2011, Tr. 427); resolved suicidal ideations (7 July 2011, Tr. 426); and increased mood swings (14 July 2011, Tr. 425).

Moreover, the fact that the treatment notes list plaintiff's condition as "stable" is not the equivalent of a finding of consistent improvement, as the ALJ's findings suggest.  *Kiefer v. Comm'r of Soc. Sec.,* No. 5:13-cv-679, 2014 WL 66717, at *5 (N.D. Ohio 8 Jan. 2014) (citing *Hicks v. Comm'r of Soc. Sec.*, No. C-1-08-24, 2009 WL 3127183, at *3 (S.D. Ohio 28 Sept. 2009) ("Stable" is a medical term that simply means a condition is neither better nor worse)); *Lechner v. Barnhart*, 321 F. Supp. 2d 1015, 1030 (E.D. Wis. 2004) ("One can be stable and yet disabled."); *Davisson v. Astrue*, No. 1:10-cv-2411, 2011 WL 2461883, at *10 (N.D. Ohio 17 Jun.

2011) ("A person can have a condition that is both 'stable' and disabling at the same time.") (citations omitted)).

Missing from the ALJ's findings regarding the allegedly benign medical reports for plaintiff is any discussion of key aspects of the treatment he receives. The Regulations require an ALJ to consider the "type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or [has] taken to alleviate [his] main or other symptoms" in evaluating a claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also* Soc. Sec. R. 96-7p, 1996 WL 374186, at *3, 7-8 (2 July 1996). The ALJ must consider the same evidence in determining a claimant's RFC. *See* Soc. Sec. R. 96-8p, 1996 WL 374184, at *5 (2 July 1996) (noting requirement that the RFC be based on, *e.g.*, "[t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)").

Here, for example, there is no evaluation by the ALJ of the intensity of the treatment plaintiff receives and how that might relate to his ability to work. The treatment is, indeed, intense. As noted, according to Dr. O'Daniel, it includes biweekly visits with Dr. O'Daniel and/or P.A. Shelton; biweekly injections; additional medications; regular visits to a therapist; and the services of a vocational counselor. Plaintiff reports three home visits a week. In his medical source statement, Dr. O'Daniel attributes the degree of stability plaintiff has achieved to the intense treatment regimen. Tr. 456. The ALJ does not address this specific finding by Dr. O'Daniel.

Notwithstanding this level of treatment, of course, Dr. O'Daniel's treatment notes, his medical source statement, and other evidence show that plaintiff continues to have breakthrough hallucinations. *See* Tr., *e.g.*, 17, 397, 448, 452, 456. Notably, in describing plaintiff's testimony

that he has had four or five such episodes over the year prior to the hearing, the ALJ stated that he had had "only" about that number. Tr. 17 ¶ 5; 51.

Presumably in part because of such breakthrough episodes, Mullins has established a protocol for monitoring plaintiff when she leaves their young daughter (2 years old at the time of the hearing) alone with him while she works three hours a day. The ALJ described this protocol by saying that Mullins "call[s] a neighbor to check on the claimant if needed." Tr. 17 ¶ 5. Mullins described the protocol in more intense terms:

> I'm working three hours a day so I call him about five to seven, eight times a day just to see how things are at the house, see how our daughter is, see what his mind set is, see if he's making any sense or not at the time. And if he is it makes some things go a lot easier and calmer, but if I can when I'm at work and if I feel I can hear it in his tone or I can sense things that aren't normal at the house I'll have our neighbor, Rachela [phonetic], come over and just come in the house and just help with Cheyenne [phonetic] and help -- you know help him get his mind, you know, off of so much stress.

Tr. 47-48. The ALJ clearly credited this testimony, as shown by his later finding that plaintiff was not credible, in part, because his version of his care for his daughter when Mullins worked was purportedly different from hers, as discussed further below. *See* Tr. 19 ¶ 5. The ALJ does not otherwise address specifically the credibility of Mullins' testimony, which was supportive of plaintiff's allegations, notwithstanding her obviously intimate familiarity with his impairments and the resulting limitations.

Further, it is not clear that the ALJ adequately considered any impact the side effects of the medications plaintiff must take has on his mental ability to work, as the ALJ was required to do. *See, e.g.,* Soc. Sec. R. 96-8p, 1996 WL 374184, at *5 (2 July 1996); *Nixon v. Astrue,* No. 2:11cv122, 2012 WL 589200, at *14 (E.D. Va. 18 Jan. 2012) ("The ALJ must also consider the negative side effects of treatment or medications on a claimant's RFC."). Dr. O'Daniel's treatment notes and medical source statement speak to significant side effects from the

medication plaintiff is taking on his mental ability to work, such as sleepiness adversely affecting his attention and concentration. Tr., *e.g.*, 425, 431, 434, 440, 455. Mullins' testimony (Tr. 49-50), as well that of plaintiff (Tr. 36-37), also describe significant side effects. Yet, the ALJ's only reference to side effects in his decision is to plaintiff's testimony regarding them (Tr. 16 ¶ 5), but, as indicated, the ALJ found plaintiff only partially credible. The ALJ's hypothetical to the vocational expert reflecting his ultimate RFC determination for plaintiff references the side effects of plaintiff's medication, although solely as a basis for the limitation that he avoid concentrated exposure to hazards. Tr. 54-55.

It is also unclear whether the ALJ adequately considered the fact that the level of stability reached by plaintiff is in a home setting, which can be drastically different from a work setting, particularly with the type of mental illness with which plaintiff suffers. *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000) ("For a person, such as [plaintiff], who suffers from an affective or personality disorder marked by anxiety, the work environment is completely different from home or a mental health clinic."); *see also Bauer v. Astrue*, 532 F.3d 606, 608–09 (7th Cir. 2008) (holding that claimant ability to perform some activities of daily living while medicated does not preclude finding of overall inability to be employed fulltime). Indeed, Dr. O'Daniel found specifically in his medical source statement that "[i]ncreased stress and change in routine are likely to exacerbate his symptoms." Tr. 456. The ALJ did not address this particular finding by Dr. O'Daniel.

Turning now to P.A. Shelton's opinions, in attributing little weight to them, the ALJ relied on his analysis of Dr. O'Daniel's opinions. The ALJ stated:

> The physician's assistant for Dr. O'Daniel, Ms. Donna Shelton, assessed on March 24, 2011, that the claimant's intermittent auditory hallucinations decreased his ability to perform tasks of any kind (Ex. 17F). As discussed above, the clinical and diagnostic evidence of record does not reflect such symptoms or

limitations. Accordingly, the undersigned has considered this evaluation but given it little weight.

Tr.19 ¶ 5. Relying as it does on the ALJ's analysis of Dr. O'Daniel's records, this explanation is flawed for comparable reasons.

In contrast to his evaluation of the opinions of Dr. O'Daniel and P.A. Shelton is the ALJ's evaluation of the opinions of the two state agency psychological consultants, Keith O. Noles, Ph.D., and Nancy Lloyd, Ph.D., who performed mental RFC assessments on 16 September 2009 and 30 August 2010, respectively. Tr. 320-337, 378-395. They both found that plaintiff had mild restriction in activities of daily living; moderate difficulties with maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and one to two episodes of decompensation of extended duration. Tr. 330, 392. Dr. Noles concluded that plaintiff could perform basic simple work skills and tasks in a low-social, low-production setting (Tr. 19 ¶ 5; 336), and Dr. Lloyd found that he could perform SRRT's in a low-stress environment avoiding contact with the public (Tr. 19 ¶ 5; 380).

In attributing significant weight to these opinions, the ALJ explained:

These opinions were consistent with and supported by the clinical and diagnostic evidence *available to the consultants at the time the opinions were offered*. Accordingly, these opinions have been given significant weight. However, based on the subsequent treatment notes, which showed further improved and consistent stability in symptoms, the undersigned has limited the claimant's social interaction to occasional contact with the public and frequent contact with co-workers.

Tr. 19 ¶ 5 (emphasis added).

Perhaps most notable about the ALJ's evaluation is that he gave greater weight to the opinions of these nonexamining sources than plaintiff's treating sources. *See* 20 C.F.R. §§ 404.1527(d)(1), (2) (stating that generally more weight is given to the opinions of an examining source, than a nonexamining source, and to sources with a treating relationship with the

claimant); 416.927(d)(1), (2) (same). And he did so when, as the ALJ acknowledges, the nonexamining consultants did not have the benefit of substantial subsequent information available to the treating sources. *See* Tr. 19 ¶ 5. While under appropriate circumstances the opinions of nonexamining sources may be given more weight than those of treating sources, *see* Soc. Sec. R. 96-6p, 1996 WL 374180, at *3 (2 July 1996), the ALJ failed to show that such circumstances are present here, particularly in light of the ALJ's errors already discussed.

Moreover, the ALJ's explanation that he gave the consultants' opinions significant weight because they were consistent with the records available to them misstates the appropriate test. The proper test is whether medical opinions are consistent with the record as a whole. *See* 20 C.F.R. §§ 404.1527(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."), 416.927(d)(4) (same); *Teague v. Astrue*, No. 1:11CV198–MR–DSC, 2012 WL 1835668, at *6 (W.D.N.C. 26 Aug. 2012) (holding it was not error for ALJ to give greater weight to the state agency physicians' opinions "even though they did not review a substantial portion of the medical evidence" because "[t]he ALJ reviewed all of the evidence and concluded that the state agency physicians' opinions were consistent with the *entire medical record*."). While the ALJ goes on to suggest that the subsequent portions of the record are also consistent with the consultants' opinions, this part of the analysis is afflicted by the ALJ's mischaracterization of Dr. O'Daniel's treatment notes, as already discussed.

The ALJ then compounded these errors in evaluating the consultants' opinions by reducing the mental limitations in his RFC determination below those found warranted by the consultants, permitting occasional contact with the public and frequent contact with co-workers. *See* Tr. 16 ¶ 5. This portion of the ALJ's evaluation, as well, reflects his mischaracterization of Dr. O'Daniel's treatment notes.

For this and the other reasons stated, the court cannot say that the ALJ's assessment of the mental impairment opinion evidence is supported by substantial evidence or based on the proper legal standards. The decision must accordingly be remanded for further proceedings.

## IV. ALJ'S ASSESSMENT OF PLAINTIFF'S CREDIBILITY

An ALJ's assessment of a claimant's credibility involves a two-step process. *Craig v. Chater*, 76 F.3d at 593-96; 20 C.F.R. §§ 404.1529(a)-(c), 416.929(a)-(c); SSR 96–7p, 1996 WL 374186, at *1 n.1; 2 (2 July 1996). First, the ALJ must determine whether plaintiff's medically documented impairments could cause plaintiff's alleged symptoms. SSR 96-7p, 1996 WL 374186, at *2. Next, the ALJ must evaluate the extent to which the claimant's statements concerning the intensity, persistence, or functionally limiting effects of the symptoms are consistent with the objective medical evidence and the other evidence of record. *See id.; see also* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (setting out factors in addition to objective medical evidence in evaluation of a claimant's pain and other symptoms). If the ALJ does not find plaintiff's statements to be credible, the ALJ must cite "specific reasons" for that finding that are "supported by the evidence." SSR 96-7p, 1996 WL 374186, at *2, 4; *Jonson v. Colvin*, No. 12cvl742, 2013 WL 1314781, at *7 (W.D. Pa. 28 Mar. 2013) ("If an ALJ concludes the claimant's testimony is not credible, the specific basis for such a conclusion must be indicated in his or her decision."); *Dean v. Barnhart*, 421 F. Supp. 2d 898, 906 (D.S.C. 2006).

In assessing plaintiff's allegations, the ALJ made the step-one finding that plaintiff's "medically determinable physical or mental impairment(s) . . . could reasonably be expected to produce the [plaintiff's] pain or other symptoms." Tr. 16 ¶ 5. At the second step of the credibility assessment, the ALJ found that plaintiff's allegations were "only partially credible" (Tr. 19 ¶ 5) and, specifically, that "the [plaintiff's] statements concerning the intensity,

persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . [RFC] assessment" (Tr. 17 ¶ 5).

The ALJ explained his ruling as follows:

> The longitudinal record showed a history of noncompliance with prescribed psychotropic mediations, which resulted in inpatient hospitalizations. The [plaintiff] reported at an emergency room visit that being off his medications caused worsening in his symptoms. Once the [plaintiff] began regular mental health treatment and consistently took his medications, the evidence of record documented consistent improvement and stabilization of symptoms, allowing him to improve significant activities of daily living. The [plaintiff's] physical impairments were managed and under control with medication and conservative treatment. Moreover, the [plaintiff's] credibility was further reduced by inconsistent testimony between he and Ms. Mullins, regarding whether or not he cares for his daughter alone. In sum, the evidence of record showed stabilization of the [plaintiff's] physical and mental symptoms, and the plaintiff is not fully credible.

Tr. 19 ¶ 5.

The ALJ's credibility assessment is flawed, in part, because it relies on his flawed analysis of the mental impairment opinion evidence. His reliance is shown in his finding that "the evidence of record documented *consistent* improvement and *stabilization* of symptoms, allowing him to improve significant activities of daily living." Tr. 19 ¶ 5 (emphasis added).

The ALJ's reliance on plaintiff's noncompliance with psychiatric medication is also problematic. As the ALJ found, medical records showed noncompliance by plaintiff in connection with his second commitment in September 2005, his third commitment in April 2009, and an emergency room visit in June 2009. Tr. 18 ¶ 5. These findings do not appear to be in dispute. (*See, e.g.*, Pl.'s Mem. 19). It is unclear how this noncompliance undermines plaintiff's credibility. His claim focuses not on his limitations when he is unmedicated, but rather on his limitations when he is. This deficiency in the ALJ's credibility assessment, as well as his

reliance on his flawed analysis of the mental impairment opinion evidence, provide further bases for remand of this case.

As to the purported inconsistency between plaintiff's testimony and Mullins', the ALJ described it as follows:

> Ms. Mullins reported that the claimant was alone with their two-year old daughter while she worked for three hours per day, and she called a neighbor to check on the [plaintiff] if needed. (In contrast, the [plaintiff] stated that he was never alone with their daughter.)

Tr. 17 ¶ 5.

The court questions whether, without further explanation, this alleged inconsistency is a proper ground for discrediting plaintiff's testimony. The intensity of the monitoring arguably raises an issue whether plaintiff is, in fact, in a meaningful sense alone even if the neighbor does not come over.

Moreover, plaintiff did not state that he was "never" alone with this daughter, as the ALJ suggests. Rather, plaintiff testified as follows:

> Q    Who takes care of the baby while [Mullins is] working?
> A    Well, she goes to work from 1:30 till 4:30 and we have a friend named Rachela Merrill [phonetic] that comes over and helps me.
> Q    Okay, you don't watch the baby by yourself?
> A    No, sir.

Tr. 32. The record does not squarely address how often Mullins has the neighbor come over to help plaintiff. If she comes over frequently, that would lend credence to plaintiff's testimony.

The court need not resolve the issue in light of the remand required on other grounds. The Commissioner, however, needs to address this concern should it arise in the remand proceedings.

## V. CONCLUSION

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's motion (D.E. 21) for judgment on the pleadings be ALLOWED, the Commissioner's motion (D.E. 24) for judgment be DENIED, and this case be REMANDED to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Recommendation.

In making this ruling, the court expresses no opinion on the weight that should be accorded any piece of evidence. That is a matter for the Commissioner to decide.

IT IS ORDERED that the Clerk send copies of this Memorandum and Recommendation to counsel for the respective parties, who shall have until 18 February 2014 to file written objections. Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge. Any response to objections shall be filed within 14 days after service of the objections on the responding party.

This, the 4th day of February 2014.

James E. Gates
United States Magistrate Judge